Toby Lee GUTHRIE, a minor By and Through his natural father and Next Friend Toby HERRING and Sandra Clark, Plaintiffs-Appellants.

v.

MISSOURI METHODIST HOSPITAL and David L. Garrison, M.D., Defendants-Respondents.

No. WD 36618.

Missouri Court of Appeals, Western District.

March 25, 1986.

Martin M. Bauman (argued), Bauman & Liles, St. Joseph, for plaintiffs-appellants.

Frank K. Nichols (argued), St. Joseph, Pope, Nichols, Hicks, for Methodist Medical Center.

Ken Rogers (argued), Springfield, Robert W. Freeman, Freeman, Fredrick, Bennett & Rogers, for Garrison.

Before NUGENT, P.J., and SHANGLER and MANFORD, JJ.

NUGENT, Presiding Judge.

This appeal arises from the entry of a judgment on a jury verdict returned against the plaintiffs and for defendants Garrison and Missouri Methodist Hospital. Plaintiffs, Toby Lee Guthrie (the decedent's minor son) and Sandra Clark (the decedent's mother) brought the action for the wrongful death of Julie Guthrie allegedly resulting from the negligence of the two defendants.

The allegations of negligence arise out of decedent Julie Guthrie's hospitalization for the delivery of her minor son and involve a medical condition, hemangiomas, with which the decedent had been inflicted since early childhood. Hemangiomas may be best described as blood tumors that cause the blood vessels to grow and "lakes" of blood to accumulate. Decedent had a number of hemangiomas on her body, but the one at issue in the trial covered the exterior of her throat and extended into her mouth and covered portions of her tongue and tonsils. Occasionally, when decedent was under stress the hemangioma in her throat would start to bleed and she would have to cough to keep the blood from accumulating in her lungs. Among the special precautions she had to take because of her condition was sleeping with her head propped on two pillows since if she lay flat the hemangiomas would swell and cut off her air passageways.

Defendant Garrison delivered decedent's baby without incident at defendant hospital. After delivery of the baby and a short stay in the recovery room, decedent was taken to a regular nursing floor. Defendant Garrison left a number of orders for her care, all standard orders he regularly gave for his patients who delivered by caesarian section. Notably, the orders contained nothing regarding decedent's hemangiomas or any special care required to keep them from presenting complications.

Early the morning after decedent delivered her baby, the nursing staff could not awaken her. Her respiration was labored, and they noted a marked swelling of her tongue and the tumor in her neck. The chronology of events from that point on is as follows:

6:45 a.m.—decedent stopped breathing and code blue was called; code blue team responded immediately.

6:55 a.m.—Dr. Garrison was notified of decedent's condition.

7:20 a.m.—decedent was transferred to the intensive care unit.

7:25 a.m.—decedent was admitted to the intensive care unit.

Dr. Garrison was present. Decedent receiving air mixture of 100 percent oxygen. Faint pulse, color pale—gray lips and nails cyanotic. No audible blood pressure. Pupils dilated and fixed.

7:30 a.m.—Dr. Garrison left intensive care unit. He talked to decedent's family and then went on daily rounds. He testified that at time he left decedent "was very near death."

7:32 a.m.—decedent's heart atrial rhythm fibulating with ventrical rate of 60 to 70 but no perfusion.

7:35 a.m.—neurological condition unchanged; decedent bleeding from the oral cavity.

7:38 a.m.—cardiac compression begun as no pulse palpitation and no blood pressure. CPR perfuses radically. Pupils dilated and fixed.

7:39 a.m.—heart rhythm very tachycardia. Code blue called as all doctors had left and doctor called in by Dr. Garrison for consultation not arrived yet. No pulse or blood pressure. CPR continued.

7:42 a.m.—left diastolic ventricular rhythm now. No perfusion. Pupils dilated and fixed. Code blue team present. CPR stopped.

7:50 a.m.—no respiration, pulse or blood pressure. Pupils dilated and fixed.

The death certificate introduced into evidence by the plaintiffs showed the time of death at 7:50 a.m.

Plaintiffs brought their wrongful death action in separate counts against defendants Garrison, the clinic by which he was employed and Missouri Methodist Hospital. The allegations of negligence against the doctor and the hospital were identical. The petition claimed that each was individually negligent in (1) failing to provide sufficient medical personnel to observe decedent during her hospitalization, (2) failing to provide sufficient monitoring equipment for decedent during her hospitalization, (3) administering central nervous system depressant drugs which hampered or prevented decedent from calling or signalling for help, (4) administering central nervous system depressant drugs which hampered or prevented decedent from helping herself, (5) failing to take precautions that would have prevented decedent's death from the difficulty with bleeding in her throat, and (6) failure to take the steps necessary to see that decedent was given proper medical care in time to prevent her death as a result of the difficulty in her throat.

At a pretrial conference, the defendants made a motion *in limine* seeking to prohibit or exclude any testimony regarding any of the facts, treatment and circumstances of the two "code blues" and subsequent treatment in the intensive care unit. The motion was premised on testimony elicited from plaintiffs' medical expert during a videotaped deposition that was to be played to the jury and in which the expert stated that decedent was "brain dead" at the time she arrived in the intensive care unit and that any actions taken in that unit would not have had any effect on the outcome. The motion was denied, and the plaintiffs presented their case. The only expert medical testimony plaintiffs offered pertaining to the conduct of the defendants during the first or second code blue was that of plaintiffs' expert witness, which was presented to the jury by way of the videotaped deposition. During that testimony, the expert said that decedent was "brain dead" on being admitted to the intensive care unit and that little or nothing could have been done to save her from that point on. Defendants renewed their motion in limine at the close of plaintiffs' case. The trial judge sustained it, stating that he did so because he felt the code blue situation presented a separate issue and that no expert medical testimony had been adduced that the manner in which either of the code

blues were handled constituted medical malpractice or that anything occurring during that time caused decedent's death. The defendants presented their case, and the jury, returned a verdict in their favor.

The plaintiffs present five points of error: The court erred (1) in sustaining the motion in limine as there was evidence of negligence occurring during the code blues; (2) in not granting plaintiffs motion for new trial against defendant Missouri Methodist Hospital as the jury verdict was against the weight of the evidence; (3) in not allowing the jury to be instructed on aggravated circumstances under MAI 5.01 as it is not necessary to plead aggravated circumstances under the Missouri wrongful death statute, or, alternatively, the issue was tried by implied consent of the parties; (4) in not allowing plaintiffs to read from the mortality tables contained in the Missouri statutes as there was no evidence that decedent would not have lived a normal life span; and (5) in allowing defendant Garrison to introduce decedent's social security records as the documents were not the originals and, thus, not the best evidence.

I.

Although not clearly presented, the plaintiffs' argument regarding the defendants' motion in limine appears to be that the evidence ultimately excluded related to defendant Garrison's duty to see that his patient was provided with competent and adequate care and to the issue of aggravating circumstances justifying an enhancement of the damages levied against the defendants. The plaintiffs contend that "[t]he denial of this evidence seriously limited the Plaintiffs' ability in showing the true callous disregard the Defendant Garrison had for his patient."

■ A court's ruling on a motion in limine to exclude particular evidence "is merely a preliminary expression of the court's opinion as to the admissibility of the evidence." *Annin v. Bi-State Development Agency,* 657 S.W.2d 382, 385 (Mo. App.1983). When the motion is sustained, its propriety is to be judged by the admissibility or inadmissibility of the evidence excluded. The instant motion in limine pertains to the relevancy of evidence concerning the two code blues so that review of the trial court's action must address that particular issue. Evidence is relevant "if the fact it tends to establish tends in turn to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue." *Charles F. Curry and Co. v. Hedrick,* 378 S.W.2d 522, 536 (Mo.1964).

■ The trial court correctly sustained the motion in limine because plaintiffs' own evidence established that the activities occurring during the code blues were not the cause of the decedent's death. While the elements of a medical malpractice action may be the same as any negligence action, generally in a malpractice case the elements of duty, breach and causation are beyond the common knowledge and understanding of the jury and must be established by expert medical testimony. *See, e.g., Steele v. Woods,* 327 S.W.2d 187, 189 (Mo.1959); *Williams v. Chamberlain,* 316 S.W.2d 505, 511 (Mo.1958); *Pedigo v. Roseberry,* 340 Mo. 724, 102 S.W.2d 600, 606 (1937); and *Miller v. Scholl,* 594 S.W.2d 324, 328 (Mo.App.1980). Plaintiffs in the instant case failed to produce any substantial evidence of probative value establishing a causal link between the actions during the code blues and decedent's death. Indeed, their testimony clearly showed that all causal activities of the defendants occurred prior to the code blues and that once the code blues began the defendants could do nothing to save the decedent's life.

■ With regard to the relevance of the evidence to the issue of aggravating circumstances, § 537.080, R.S.Mo.Supp.1984, establishes liability for causing the wrongful death of another, whereas § 537.090, R.S.Mo.Supp.1984, sets out the factors to be considered by the jury in assessing damages in a wrongful death action. Relevant to the instant case, § 537.090 provides that "[t]he mitigating or aggravating circum-

stances attending the death may be considered by the trier of fact...." Consideration of aggravating circumstances is punitive in nature. *In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 644 F.2d 594, 606 (7th Cir.1981) (applying Missouri law); *Wiseman v. Missouri Pacific Railroad Co.*, 575 S.W.2d 742, 752 (Mo. App.1978); *Contestible v. Brookshire*, 355 S.W.2d 36, 42 (Mo.1962); *Williams v. Excavating & Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123, 127 (1936). To sustain an award in a wrongful death action in an amount greater than compensation for injuries, the evidence must show "willful misconduct, wantonness, recklessness, or a want of care indicative of indifference to consequences." *Williams v. Excavating & Foundation Co.* 93 S.W.2d at 127. In terms of relevance of the evidence to the issues pleaded in the case, the fact that the plaintiffs did not plead aggravating circumstances is immaterial since that element of damages was properly in the case by virtue of § 537.090. *Contestible v. Brookshire* at 42; *May v. Bradford*, 369 S.W.2d 225, 229 (Mo.1963).

■ The only evidence concerning aggravating circumstances was that defendant Garrison left decedent unattended by physicians while she was very near death and the excluded testimony of the expert that defendant Garrison should have stayed in the intensive care unit and continued to work to keep her alive. Actions subsequent to those for which damages are sought may be relevant and "admissible under an issue of exemplary damages if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed." *Charles F. Curry and Co. v. Hedrick*, at 536. But we detect no connection between defendant Garrison's conduct during the code blues and his actions before that time. The provision for enhancement of damages for aggravating circumstances as with an award of punitive damages is intended both to punish and to deter outrageous conduct. But, as the cases unequivocally show, outrageous conduct is to be punished only when it is the cause of the injuries complained of. *See, e.g., Williams v. Excavating & Foundation Co., supra; Contestible v. Brookshire, supra; Wiseman v. Missouri Pacific Railroad Co., supra.* Section 537.090 is also clear in this respect: "[t]he mitigating or aggravating circumstances *attending* the death may be considered by the trier of fact...." (emphasis added). Since the actions occurring during the code blues were not shown to be causally connected to the decedent's death, the plaintiffs would not have been entitled to recover for aggravating circumstances.

The foregoing discussion concerning aggravating circumstances also disposes of plaintiffs' third point on appeal. The court did not err in failing to give an instruction on aggravating circumstances since the giving of the instruction was not supported by the evidence. *See, e.g., Finninger v. Johnson*, 692 S.W.2d 390 (Mo.App.1985).

## II.

■ Plaintiff next complains that a new trial should have been granted because the verdict was against the weight of the evidence. The medical records tracing the activities of one of the hospital's nurses who treated decedent during the critical period on the morning of decedent's death establishes, they assert, the negligence of defendant hospital.

Where substantial evidence of probative value supports the verdict, the trial court may deny a motion for new trial. *Taylor v. F.W. Woolworth Co.*, 641 S.W.2d 108, 111 (Mo.1982) (en banc).

■ No abuse of that discretion appears in the instant case. Assuming *arguendo* that the records constituted admissions of a party opponent (as plaintiffs assert), they were evidentiary admissions and, as such, could be impeached by other evidence. *See, e.g., McCormick on Evidence, supra,* § 263, at 776, for an explanation of the difference between evidentiary and judicial admissions. Other evidence was adduced at trial that both explained and contradict-

ed the information contained in the medical records and substantially impeached their accuracy. More importantly, the medical records in question spoke only to the element of breach of duty. The defendants presented substantial evidence of probative value from which the jury could return a verdict in favor of defendants on the element of causation.

## III.

During the course of the trial, for the purpose of establishing damages, plaintiffs sought to introduce the mortality tables contained in volume 42 of Vernon's Annotated Missouri Statutes as proof of the decedent's life expectancy. The trial court excluded the evidence on the grounds that the plaintiff failed to establish that decedent would lead a normal life.

■ The general rule regarding the admission of mortality tables and the evidentiary foundation required for them is that mortality tables are only guides or suggestions and may not be rejected because of sharp variances in the hazards of life among individuals, which go to the probative value of the evidence and not to its admissibility. The probative value of the mortality tables may be weakened or destroyed by evidence of ill-health of the person whose life expectancy is in issue. Such matters may be considered by the jury in weighing the testimony, but they do not render it incompetent. *Moore v. Ready Mixed Concrete Co.*, 329 S.W.2d 14, 28 (Mo.1959) (en banc). *See also Dorsey v. Muilenburg*, 345 S.W.2d 134, 142 (Mo. 1961). Under this rule the plaintiffs were not required to show that the decedent would have led a normal life.

Nevertheless, the error was harmless, as it related solely to the issue of damages. The jury never reached the issue of damages. The appellate court will not reverse a judgment if the trial error does not materially affect the merits of the action. Rule 84.13(b). *Jackson v. Haley*, 432 S.W.2d 281, 284 (Mo.1968); *Durmeier v. St. Louis County Bus Co.*, 203 S.W.2d 445, 449 (Mo. 1947).

## IV.

■ Finally, plaintiff complains that the copies of Social Security records offered by defendant Garrison were not the "best" evidence. The copies in question were three exhibits, two of which recorded investigatory interviews with decedent and a third that showed the final disposition of her claim. They were introduced during the testimony of the Social Security case worker who had handled the decedent's claim for permanent disability. The witness used the exhibits to refresh his recollection of the interviews. He also testified that decedent's claim for disability had been allowed. On voir dire by plaintiffs, and after he had used the documents to refresh his recollection, the case worker testified that he had made no attempt to obtain the originals from the record center in Maryland.

The best evidence rule does not apply and the original will not be required when the facts contained in the documentary evidence are independently proved at trial. *Jourdan v. Gilmore*, 638 S.W.2d 763, 770 (Mo.App.1982); *State v. Prince*, 628 S.W.2d 920, 921 (Mo.App.1982). The court ruled correctly in this case. The Social Security records contained facts that the decedent had conveyed to the case worker regarding her physical condition and the final disposition of her claim. The case worker who handled decedent's claim testified from his recollection to what he had seen and been told during his two interviews with decedent and what the final outcome of her claim for disability benefits had been. The facts were independently proved at trial and the best evidence rule did not apply.

For the foregoing reasons, we affirm the trial court's judgment.

All concur.